**UNITED STATES BANKRUPTCY COURT**
**SOUTHERN DISTRICT OF NEW YORK**

------------------------------------------------------------------------ x
                                               :
In re:                                         :     **NOT FOR PUBLICATION**
                                               :
SVB FINANCIAL GROUP,                           :     Chapter 11
                                               :
                              Debtor.          :     Case No. 23-10367 (MG)
                                               :
------------------------------------------------------------------------ x
                                               :
SVB FINANCIAL GROUP,                           :
                                               :
                              Plaintiff,       :
                                               :
                                               :     Adv. Pro. No. 23-1091 (MG)
                                               :
                    v.                         :
                                               :
UBS SECURITIES LLC,                            :
                                               :
                              Defendant.       :
                                               :
------------------------------------------------------------------------ x

### MEMORANDUM OPINION ENJOINING CERTAIN
### PENDING ARBITRATION PROCEEDINGS COMMENCED BY UBS SECURITIES LLC

*A P P E A R A N C E S :*

JENNER & BLOCK LLP
*Proposed Counsel to the Debtor*
353 N. Clark Street
Chicago, Illinois 60654
By:     Vincent E. Lazar, Esq.
        Landon S. Raiford, Esq.

1155 Avenue of the Americas
New York, NY 10036
By:     Marc B. Hankin, Esq.
        Carl N. Wedoff, Esq.

HUGHES HUBBARD & REED LLP
*Counsel to UBS Securities LLC*
One Battery Park Plaza
New York, NY 10004
By:     William R. Maguire, Esq.
        Carl W. Mills, Esq.

AKIN GUMP STRAUSS HAUER & FELD LLP
*Proposed Counsel to the Official Committee*
*of Unsecured Creditors of SVB Financial Group*
One Bryant Park
New York, NY 10036-6745
By:     Ira S. Dizengoff, Esq.
        David M. Zensky, Esq.
        Joseph L. Sorkin, Esq.
        Brad M. Kahn, Esq.

2001 K Street NW
Washington, DC 20006
By:     James R. Savin, Esq.

**MARTIN GLENN**
**UNITED STATES BANKRUPTCY JUDGE**

Pending before the Court is the motion (the "Motion," ECF Doc. # 8) of SVB Financial Group, debtor and debtor-in-possession ("SVB Financial" or "Debtor" or "Plaintiff"), for an order enjoining the continuation of the following two arbitrations for a period of 120 days (without prejudice to the Debtor seeking an extension): *UBS Securities LLC v. SVB Leerink LLC, et al.*, FINRA Dispute Resolution No. 21- 02142 (the "New York Arbitration"), and *UBS Securities LLC v. Jason Auerbach, et al.*, FINRA Dispute Resolution No. 22-00363 (the "California Arbitration," and together with the New York Arbitration, the "Arbitrations"). In support of the Motion, the Debtor relies upon the *Declaration of William C. Kosturos* (the "Kosturos Declaration") attached to the Motion as Exhibit B and the *Declaration of Steven P. Heineman* (the "Heineman Declaration" or "Heineman Decl.") attached to the Motion as Exhibit C. Both declarations were admitted into evidence during the hearing.

UBS Securities, LLC ("UBS") filed opposition papers (the "Opposition," ECF Doc. # 14) as well as an affidavit of Carl W. Mills (the "Mills Decl.," or "Mills Declaration," ECF Doc. # 15). UBS, however, did not move the Mills Declaration into evidence, so the Mills Declaration and its attached exhibits are not in the record. The Official Committee of Unsecured Creditors (the "Committee") filed a response in support of the Motion (the "Committee Response," ECF Doc. # 18) as well as a motion to intervene (the "Motion to Intervene," ECF Doc. # 16).

The Court held a hearing on April 12, 2023 to consider the Motion and the Motion to Intervene. During the hearing, Mr. Heineman was made available for, and was cross examined by, UBS's counsel. At the hearing the Court also granted the Committee's Motion to Intervene.

For the reasons discussed below, the Court **GRANTS** the Motion and **ENJOINS** the Arbitrations for 120 days.

3

## I.   BACKGROUND

### A.  The Chapter 11 Case

The Debtor is a holding company whose business is conducted through its subsidiaries and affiliates.  (Motion ¶ 2.)  Prior to March 10, 2023, the Debtor owned and operated Silicon Valley Bank, a state-chartered bank.  (*Id.* ¶ 14.)  On March 10, 2023, the California banking authorities closed Silicon Valley Bank and appointed the Federal Deposit Insurance Corporation as receiver ("FDIC-R").  (*Id.*)  On March 17, 2023 (the "Petition Date"), the Debtor filed a voluntary petition for relief under chapter 11 of the Bankruptcy Code.  (ECF Doc. # 1.)

### A.  SVB Securities

SVB Securities is an SEC registered broker-dealer providing investment banking services across the healthcare and technology sectors.  (Motion ¶ 16.)  SVB Securities focuses on the following product and service offerings: capital raising, M&A advisory, structured finance, equity research, and sales and trading.  (Kosturos Decl. ¶ 10.)  SVB Securities is a wholly-owned indirect subsidiary of the Debtor.  (*Id.*)

Following the FDIC-R's takeover of Silicon Valley Bank, the Debtor now derives the majority of its value (according to the Debtor's latest annual 10-K, approximately $523 million or 89% of the Debtor's total revenue from SVB Securities' contracts with customers, after deducting the revenues derived from Silicon Valley Bank and SVB Private businesses, which are no longer associated with the Debtor).  (*Id.*)

### B.  The Arbitrations

On August 17, 2021, UBS filed a Statement of Claim with FINRA Dispute Resolution in New York against SVB Securities (formerly known as SVB Leerink LLC) and fifteen individual

respondents who at that time were investment bankers employed by SVB Securities.[1] (Heineman Decl. ¶ 4.)  On February 17, 2022, UBS filed the California Arbitration—a related arbitration proceeding against some of the same individuals.  (*Id.*)  Together, the Arbitrations involve claims against SVB Securities and the fifteen individuals (the "Individual Respondents") related to the same fundamental dispute.  (*Id.*)

The Arbitrations arise out of the Individual Respondents' resignations from UBS in May 2021, and their hiring by SVB Securities in July and August 2021.  (*Id.* ¶ 5.)  UBS claims, among other things, that the Individual Respondents violated contractual and fiduciary duties to UBS and that SVB Securities aided and abetted these purported breaches.  (*Id.*)

UBS did not commence the New York Arbitration until three months after the Individual Respondents gave notice of their resignations and after each Individual Respondent had started working at SVB Securities.  (*Id.* ¶ 6.)  UBS did not move for a preliminary or temporary injunction in court, and it is seeking only money damages.  (*Id.* ¶6.)  Specifically, UBS seeks substantial compensatory damages for its alleged "lost profits" over a four-year period beginning after the Individual Respondents resigned from UBS through May 2025.  (*Id.*)  SVB Securities rejects UBS's legal arguments, factual predicates, and damages analysis.  (*Id.*)

The Arbitrations have been actively litigated since UBS filed the first case in August 2021.  (*Id.* ¶ 7.)  The parties collectively produced a total of approximately 32,000 documents, and various third parties produced hundreds of additional documents.  (*Id.*)  Affirmative expert reports were served in February and rebuttal expert reports were due April 6, 2023.  (*Id.*)  The parties have litigated motions to compel brought by both sides, and a motion to compel by UBS

---

[1]        At the hearing there was some lack of clarity whether these fifteen individuals have officially separated from the company.  The Court finds based on the testimony of Mr. Heineman that regardless of these individuals' technical employment status, they are playing no role in the Debtor's restructuring and thus that their participation in the Arbitration in and of itself does not divert any resources away from the Debtor's restructuring.

seeking to require SVB Securities to produce additional documents is currently pending before the New York Arbitration Panel. (*Id.*)  Numerous additional third-party subpoenas for documents and trial testimony are outstanding. (*Id.*)  The deadline to serve pre-trial briefs, witness lists, and exhibit lists is April 25, 2023, in the New York Arbitration and May 30, 2023 in the California Arbitration.  The evidentiary hearings in the New York Arbitration are scheduled for May 15–19, 2023; May 22–26, 2023; and July 24–28, 2023. (*Id.*)  The California Arbitration evidentiary hearings are scheduled for June 19–23, 2023 the New York Arbitration are scheduled for May 15–19, 2023; May 22–26, 2023; and July 24–28, 2023. (*Id.*)  The California Arbitration evidentiary hearings are scheduled for June 19–23, 2023. (*Id.*)

On March 13, 2023, SVB Financial announced that it had appointed a restructuring committee of its board of directors to explore strategic alternatives for several of its remaining businesses, including SVB Securities. (*Id.* ¶ 9.)  On March 15, 2023, SVB Securities and the Individual Respondents asked the New York FINRA Arbitration Panel (the "New York Arbitration Panel") to order a 120-day postponement of the New York hearing in light of these extraordinary developments. (*Id.* ¶ 10.)  UBS opposed the postponement request. (*Id.*)

Two days later, on March 17, 2023, SVB Financial filed for chapter 11 bankruptcy protection in this Court. (*Id.* ¶11.)  In its press release announcing the chapter 11 filing, SVB Financial stated that it "intends to use the court-supervised process to evaluate strategic alternatives for . . . SVB Securities," and is actively marketing SVB Securities for sale and exploring alternatives for a standalone reorganization. (*Id.*)

On March 27, 2023, the New York Arbitration Panel denied SVB Securities'
postponement request without providing any rationale for its decision.[2]  (*Id.* ¶ 12.)  In the same
order, the New York Panel also reiterated the case schedule of fifteen trial days for the New
York Arbitration beginning on May 15, 2023 (May 15–19, 2023, May 22–26, 2023, and July 24–
28, 2023).  (*Id.*)  UBS has advised SVB Securities in communications to counsel that it will
demand testimony from the most senior members of SVB Securities in the early days of the May
hearing, including the firm's Chief Executive Officer (the "CEO") and the Chief Administrative
Officer (the "CAO").  (*Id.*)  Other key witnesses in the Arbitrations are likely to include, among
others, SVB Securities' Head of Human Resources and its Co-Heads of Investment Banking.
Given that UBS has asserted related claims against SVB Securities and 15 individual bankers,
SVB Securities avers that it expects that more than 25 defense witnesses will testify at each of
the New York and California Arbitrations.  (*Id.*)

Though counsel for UBS did not move the underlying emails into the record, testimony at
the hearing indicated that, on March 31, 2023, two weeks after the Debtor filed for bankruptcy
and following FINRA's denial of the request to postpone the Arbitrations, in response to a
question via email about whether the SVB Securities' CEO and CAO—Mr. Leerink and Mr.
Gentile—would be available to testify at the Arbitrations, counsel for the Debtor stated that they
"anticipate[d] no issues with UBS's plan to call" those two witnesses during the upcoming May
hearing dates.  (Opposition ¶ 5.)  Mr. Heineman testified in essence that SVB Securities' position
was that if the Arbitrations went forward, the witnesses would be available, as required, but that
it was always SVB Securities' position that they needed a postponement of the Arbitrations.

---

[2]       The Individual Respondents in the California Arbitration also sought postponement of that arbitration but
withdrew the request after the New York Arbitration Panel denied SVB Securities' request to postpone the New
York Arbitration.

If the trials proceed, SVB Securities' general counsel states he will be personally involved in the task of preparing many of the senior witnesses. (*Id.* ¶ 12.) Although SVB Securities is not a respondent in the California arbitration, SVB Securities' general counsel avers that SVB Securities must play the same integral role in the preparation for, and defense of, the California Arbitration, including through the testimony of its senior executives. (*Id.*)

SVB Securities' general counsel avers that SVB Securities' senior management is currently required to focus entirely on shepherding SVB Securities through the complex ramifications of the failure of Silicon Valley Bank, the Debtor's chapter 11 proceeding, and facilitating strategic alternatives for SVB Securities. (*Id.* ¶ 13.) With the first arbitration scheduled to begin in just under six weeks, SVB Securities' general counsel avers that they are now in the most critical and intense stage of trial preparation. (*Id.* ¶ 14.) He avers that he is the only member of the small SVB Securities Legal Department with litigation expertise and has been actively involved in all aspects of the Arbitrations since the New York Arbitration was filed in August 2021, including managing outside counsel, making strategic and tactical decisions, reviewing and revising pleadings and motions, assisting with discovery, participating in witness interviews and other pre-hearing work. (*Id.*) But since the Silicon Valley Bank crisis began, however, Mr. Heineman states he has been unable to devote adequate time to supporting preparation for the hearings because of his responsibilities related to crisis management and the sale process. (*Id.*) At the hearing, UBS argued that SVB Securities had several outside firms who were handling the Arbitration such that the burden on Mr. Heineman should not be overwhelming.

### C.  The UBS Opposition

UBS's Opposition argues that the Court should not enjoin the Arbitrations.  First, it argues that the Court lacks subject matter jurisdiction to issue the requested injunction. (Opposition ¶¶ 30–36.)  Next, UBS argues that that the Debtor has not established grounds for imposing an injunction given that only two employees of SVB Securities, and not any employees of the Debtor, would have to testify in the Arbitrations.  (*Id.* ¶ 41.)  UBS notes that the burden from these witnesses' participation in the hearing is not significant as evidenced by the fact that, on March 31, 2023, SVB Securities indicated that it "anticipates no issues with UBS's plan to call [the SVB Securities employees] during the rough windows outlined in your email below." (*Id.* ¶ 27.)  It further argues that that there is no harm to the Debtor because all the cases the Debtor cites involved the possibility that the litigation might divert the attention of the Debtor's employees, not the non-debtor, such that they are distinguishable.  (*Id.* ¶ 44.)  Finally, UBS argues that the public interest weighs in favor of denying the injunction because federal courts are encouraged to favor arbitration. (*Id.* ¶ 55.)

### D.  The Indemnification of Individual Respondents

At the conclusion of the hearing counsel for the Debtor claimed that the Individual Respondents in the Arbitrations were entitled to indemnification by SVB Securities.  The Court directed the Debtor to file certain offer letters and an operating agreement (the "Indemnification Documents") containing such indemnification provisions.  The Debtor filed the Indemnification Documents at ECF Doc. # 19.  UBS's counsel stated that he is familiar with these documents and has no objection to them being admitted in evidence.  Redacted copies of the letters and operating agreement, including only the indemnification provisions, are admitted in evidence.

The Indemnification Documents include (1) eight offer letters (the "Offer Letters") for the Individual Respondents which contain indemnification provisions and (2) an operating agreement (the "Operating Agreement") dated as of December 13, 2013 between Leerink Swann LLC (now SVB Securities) and its members, which also contains an indemnification provision. The Offer Letters provide indemnity for "reasonable attorneys' fees . . . costs, expenses, awards, settlements and damages incurred by [the employee] . . . based on claims by your current employer arising out of and relating to your transition from your current employer to the Company."  (*See, e.g.*, Indemnification Documents at 11 (page 9 of the Offer Letter of Jason Auerbach).)  The Operating Agreement provides that any interest holder or member of SVB Securities who is sued because of the fact that he or she serves as an officer, director, or manager of SVB Securities shall be indemnified by SVB Securities "to the fullest extent permitted by law."  (Indemnification Documents at 75.)

### E.  The Committee Response

The Committee's Response states that the Committee supports the injunction given the importance of SVB Securities and its investment banking business to the Debtor's restructuring efforts.  (Committee Response ¶ 2.)  The Committee states that delaying the Arbitrations by 120 days will cause minor inconvenience to UBS while providing much needed breathing room for the Debtor and SVB Securities to determine the optimal path to maximizing value for the benefit of the Debtor's unsecured creditors.  (*Id.* ¶ 3.)

## II.    <u>LEGAL STANDARD</u>

### A.  Application of the Automatic Stay to Non-Debtors

Section 362(a) operates as an automatic stay applicable to all entities of, *inter alia*, "the commencement or continuation . . . of a judicial, administrative, or other action or proceeding . .

. to recover a claim against the debtor that arose before the commencement of the case under this title." 11 U.S.C. § 362(a)(1). The automatic stay is "one of the fundamental debtor protections provided by the bankruptcy laws." *Midlantic Nat'l Bank v. New Jersey Dep't of Evntl. Prot.*, 474 U.S. 494, 503 (1986); *see also In re Heating Oil Partners, LP*, 422 F. App'x 15, 17 (2d Cir. 2011). It provides the debtor with a "breathing spell" from creditors, which, in combination with other provisions of the Bankruptcy Code, is essential to a debtor's ability to achieve its bankruptcy objectives. *See, e.g.*, *In re Ionosphere Clubs, Inc.*, 922 F.2d 984, 989 (2d Cir. 1990) (citations omitted).

Although section 362(a) operates primarily as a shield for the debtor, courts can, and do, extend its protection to non-debtors in various circumstances, including where an action against the non-debtor will have an immediate adverse economic consequence for the debtor's estate. *See Queenie, Ltd. v. Nygard Int'l*, 321 F.3d 282, 287 (2d Cir. 2003) (extending automatic stay to wholly-owned subsidiary of debtor); *In re R&G Fin. Corp.*, 441 B.R. 401, 409–10, 415 (Bankr. D.P.R. 2010) (extending automatic stay to enjoin FINRA arbitration against a wholly-owned subsidiary of debtor); *In re Neuman*, 128 B.R. 333, 336-37 (S.D.N.Y. 1991) (finding that lawsuit against debtor's majority-owned direct and indirect non-debtor subsidiaries violated the automatic stay).

### B. Preliminary Injunctions

The mechanism by which the Court can extend the protections of the automatic stay to non-debtors is section 105(a) of the Bankruptcy Code. *See* 11 U.S.C. § 105(a). Section 105(a) authorizes this Court to "issue any order, process, or judgment that is necessary or appropriate to carry out the provisions of this title" and provides this Court with broad, equitable powers to "assure the orderly conduct of the reorganization proceedings." *Id.*; *Garrity v. Leffler (In re*

11

*Neuman),* 71 B.R. 567, 571 (S.D.N.Y. 1987) (citing *In re Baldwin-United Corp. Litig.,* 765 F.2d

343, 348 (2d Cir. 1985)).  "Section 105(a) is to be 'construed liberally to enjoin suits that might

impede the reorganization process'—or, as here, the process of liquidation." *In re Bernard L.*

*Madoff Inv. Sec., LLC,* 512 F. App'x 18, 20 (2d Cir. 2013) (quoting *MacArthur Co. v. Johns-*

*Manville Corp.,* 837 F.2d 89, 93 (2d Cir. 1988)).  A section 105 injunction is also a proper

vehicle by which to stay a FINRA arbitration against a nondebtor subsidiary. *See, e.g., In re*

*R&G Fin. Corp.*, 441 B.R. at 411–12.

To determine whether to enjoin actions against non-debtors under section 105(a), courts

look to the requirements of Federal Rule of Civil Procedure 65:

> (1) whether there is a likelihood of successful reorganization, (2) whether
> there is an imminent irreparable harm to the estate in the absence of an
> injunction, although a limited exception permits an injunction to issue
> whether the action to be enjoined is one that threatens the reorganization
> process if the threat is not imminent, (3) the balance of the comparative
> harms to the debtor, and to the debtor's reorganization, against that to the
> would-be-enjoined party.

*In re Purdue Pharms. L.P.*, 619 B.R. 38, 58 (S.D.N.Y. 2020); *accord Soundview Elite Ltd.*, 543

B.R. 78, 118-19 (Bankr. S.D.N.Y. 2016); *Lyondell Chem. Co.*, 402 B.R. 571, 588-89 (Bankr.

S.D.N.Y. 2009).

 "In evaluating these factors, the court takes a flexible approach and no one factor is

determinative." *In re Calpine Corp.*, 365 B.R. 401, 409 (S.D.N.Y. 2007) (quotation omitted).

## III.    <u>DISCUSSION</u>

The Court finds that a preliminary injunction imposing a 120 day stay of the Arbitrations

is proper.  As an initial matter, the Court has jurisdiction to stay the Arbitrations.  Next, the court

finds that the automatic stay by its terms does not apply to the Arbitrations.  Nevertheless,

because each of the four elements enumerated in Federal Rule of Civil Procedure 65 are met the

Debtor has established grounds for extending the protection of the automatic stay to enjoin the Arbitrations.

## A. The Court has Jurisdiction to Stay the Arbitrations

Section 1334(b) of title 28 of the United States Code identifies three types of proceedings over which this Court has jurisdiction—(1) those "arising under title 11," (2) those "arising in" a case under title 11, and (3) those "related to" a case under title 11.  11 U.S.C. § 1334. Proceedings "arise under" title 11 when the cause of action or "claims clearly invoke substantive rights created by bankruptcy law." *In re Housecraft Indus. USA, Inc.*, 310 F.3d 64, 70–71 (2d Cir. 2002).  Proceedings "arise in" a bankruptcy case if they "are not based on any right expressly created by title 11, but nevertheless, would have no existence outside of the bankruptcy." *Baker v. Simpson*, 613 F.3d 346, 351 (2d Cir. 2010).  "A bankruptcy court has 'related to' jurisdiction over every case where 'the action's outcome might have any conceivable effect on the bankrupt estate.'" *In re Purdue Pharms. L.P.*, 619 B.R. 38, 48–49 (S.D.N.Y. 2020) (quoting *SPV Osus Ltd. v. UBS AG*, 882 F.3d 333, 339–40 (2d Cir. 2018)).

"An action is related to bankruptcy if the outcome could alter the debtor's rights, liabilities, options, or freedom of action (either positively or negatively) and which in any way impacts upon the handling and administration of the bankrupt estate." *SPV*, 882 F.3d at 340 (quoting *Celotex Corp. v. Edwards*, 514 U.S. 300, 308 n.6 (1995)).  "[T]he touchstone for bankruptcy jurisdiction remains whether its outcome might have any conceivable effect on the bankruptcy estate," i.e., whether one possible result of the suit "will be the removal of assets from the bankruptcy estate." *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012).

Here, the Court has multiple sources of jurisdiction to stay the Arbitration.  First, the Court has "arising under" jurisdiction to determine that section 362(a) of the Bankruptcy Code

prohibits the continuation of the Arbitrations.  *See, e.g.*, *In re Roman Catholic Diocese of Syracuse, New York*, 628 B.R. 571, 577 (Bankr. N.D.N.Y. 2021).  UBS argues that the Court does not have "arising under" jurisdiction because the claims seeking to be stayed are not created by the Bankruptcy Code.  (Opposition ¶ 31.)  But Courts have held just the opposite.  For example, in *In re Brier Creek Corp. Ctr. Assocs. Ltd.*, 486 B.R. 681, 685 (Bankr. E.D.N.C. 2013), the Court found that it had "arising under" jurisdiction because the Debtor requested an order confirming that the stay under 362(a)(1), which was a creature of the Bankruptcy Code, applied to stay arbitrations.  Here, similarly, the Debtor seeks the extension of the automatic stay to a non-debtor, which confers "arising under" jurisdiction.

But even assuming for the sake of argument that the Court did not have "arising under" jurisdiction, the Court also has "arises in" and "related to" jurisdiction over the request for a preliminary injunction under section 105(a) because the Arbitrations' continued prosecution risks direct and substantial negative impact on the Debtor's estate.  *See, e.g., In re Lyondell Chemical Co.*, 402 B.R. at 586–87 (finding that "arising under", "arising in", and "related to" jurisdiction existed over debtor's request for injunction under sections 105(a) and 362(a) "to protect existing property of the estate, and to protect the estate's ability to reorganize").

UBS concedes that "related to" jurisdiction is broad but argues that the Second Circuit limits "related to" jurisdiction to a situation where the third party claims directly affect the *res* of the bankruptcy estate.  (Opposition ¶ 33 (citing *Johns-Manville Corp. v. Chubb Indemnity Ins. Co. (In re Johns-Manville Corp.)*, 517 F.3d 52, 66 (2d Cir. 2008)).)  UBS thus argues that because the Debtor does not argue that the FINRA arbitrations will result in removal of assets from the Debtor's estate, such as through liability for attorney's fees, there is no "related to jurisdiction."  Not so.  The test in the Second Circuit remains whether the litigation "has any

conceivable effect" on the bankrupt estate. *In re Lyondell Chem. Co.*, 402 B.R. 571, 586–87

(internal citation omitted). Here, the Debtor easily clears that hurdle by providing testimony that

being diverted from their reorganization efforts could affect their ability to maximize the value of

the estate. (Heineman Decl. ¶ 15.)

   *John Manville Corp.*, which UBS cites, is not to the contrary. (Opposition ¶ 33.) In *John

Manville Corp.* the Court held that "it was inappropriate for the bankruptcy court to enjoin

claims brought against a third-party non-debtor *solely on the basis of that third-party's financial

contribution to a debtor's estate*" and commented that enjoining third-party non-debtor claims

should be limited to claims that "directly affect the *res* of the bankruptcy estate." 517 F.3d 52 at

66 (emphasis added). But here, the Debtor is not asking to enjoin the claims solely because of

SVB Securities' contribution to the estate, it is asking for an injunction because the distraction of

its personnel could affect the success of its reorganization. Further, one of the cases UBS cites in

support of its position that a direct effect on property is required to confer "related to

jurisdiction" is *In re Quigley Co., Inc.*, 676 F.3d 45, 57 (2d Cir. 2012), which held that "while we

have treated whether a suit seeks to impose derivative liability as a helpful way to assess whether

it has the potential to affect the bankruptcy *res*, the touchstone for bankruptcy jurisdiction

remains "whether its outcome might have any 'conceivable effect' on the bankruptcy estate."

Thus, the Second Circuit has affirmed that notwithstanding related inquiries regarding the

potential effect on bankruptcy *res*, the "conceivable effect" test remains the controlling inquiry

for jurisdiction. *Id.*

   During the hearing, counsel for UBS argued that *In re Purdue Pharms. L.P.*, 619 B.R. 38

(S.D.N.Y. 2020) supported its position that the law in the Second Circuit only confers

jurisdiction on a bankruptcy court over a non-debtor if there is a direct financial effect on estate

*res*. Not so. *Purdue* held that "the touchstone for bankruptcy jurisdiction remains whether its outcome might have any conceivable effect on the bankruptcy estate" and noted that one such "conceivable effect" is the possibility that the suit to be enjoined would lead to the "removal of assets from the bankruptcy estate." 619 B.R. 49. Again, one way, but not the only way, to meet the "conceivable effects" test is to show that assets are likely to be removed from the estate. *See id.* (noting that "'related to jurisdiction' . . . offers broad protection to both debtors and third parties" and that there is "no requirement that an action must both directly affect the estate *and* be derivative of the debtor's rights and liabilities for bankruptcy jurisdiction over the action to exist") (internal citations and quotations omitted) (emphasis in original).

In any event, even if the Second Circuit did require that the Debtor show a direct effect on the *res* of the estate from the action to be enjoined, the Debtor meets that threshold as well. Though the Court does not have detailed information about the claims at issue in the Arbitrations, based on the record before it, the Court concludes that the broad indemnification provisions contained in the Indemnification Documents are highly likely to require SVB Securities to indemnify the Individual Respondents. The indemnity obligation in the Offer Letters covers "claims by your current employer arising out of and relating to your transition from your current employer to the Company." (*See, e.g.*, Indemnification Documents at 11 (page 9 of the Offer Letter of Jason Auerbach).) Mr. Heineman testified that SVB Securities has already advanced several million dollars as indemnification for defense costs for the Individual Respondents. Here, the claims at issue relate to liability in connection with the Individual Respondent's transition from UBS to SVB Securities and thus clearly fall within the purview of the indemnity clause. (*See* Motion ¶ 20.) Given that SVB Securities is a wholly-owned Debtor subsidiary (through an intermediate wholly-owned company) that is responsible for the majority

16

of the Debtor's value, these indemnity obligations will undoubtedly directly affect *res* of the estate.

### B. The Automatic Stay by it Terms Does Not Apply to the Arbitrations

It is well-established that stays pursuant to § 362(a) are limited to debtors and do not encompass related non-debtor entities who are defendants in lawsuits. *See Tchrs. Ins. & Annuity Ass'n of Am. v. Butler*, 803 F.2d 61, 65 (2d Cir. 1986). Here, because SVB Securities, and not the Debtor, is a defendant in the New York Arbitration, and neither the Debtor nor SVB Securities is a defendant in the California Arbitration, the automatic stay does not apply to the Arbitrations. Nevertheless, as discussed below, where certain conditions are met, courts will extend the protections of the automatic stay to non-debtors.

### C. The Requirements for Granting a Preliminary Injunction Are Met Such that the Court Should Expend the Protections of the Automatic Stay

To determine whether to extend the protection of the automatic stay to enjoin actions against non-debtors under section 105(a) of the Bankruptcy Code courts look to the requirements of Federal Rule of Civil Procedure 65 ("FRCP 65"). *In re Purdue Pharms. L.P.*, 619 B.R. at 45. Here, the Court finds that an analysis of FRCP 65 indicates that extending the automatic stay to enjoin the Arbitrations is proper.

#### 1. The Debtor's Chapter 11 Case is Reasonably Likely to Succeed

The first prong of the preliminary injunction standard in the bankruptcy context considers whether there is a reasonable likelihood of a successful resolution to the chapter 11 case. *See In re Lyondell Chem. Co.*, 402 B.R. at 589; *In re W.R. Grace & Co.*, 386 B.R. 17, 33 (Bankr. D. Del. 2008); *In re Calpine*, 365 B.R. at 410. A chapter 11 case "may be considered likely to succeed so long as the prospects of reorganization remain viable and if the Debtors are substantially more likely to reorganize with the injunction in place." *In re Purdue Pharms. L.P.*,

619 B.R. 38, 59 (S.D.N.Y. 2020) (internal citations and quotation marks omitted). When a debtor seeks a preliminary injunction at the outset of its chapter 11 case, courts afford the debtor the benefit of the doubt so long as the case is generally on track, "[e]specially since emergency requests to protect an estate's ability to reorganize often come up in a chapter 11 case's earliest stages, [and] there is no way to predict what will ultimately happen in a large chapter 11 case as new issues arise." *In re Lyondell Chem. Co.*, 402 B.R. at 589.

Here, recognizing that this case is in its infancy, the Debtor has established a reasonable likelihood of successful reorganization. The Debtor states that it is presently evaluating strategic alternatives for its remaining businesses and assets, including various standalone reorganization and sale options. (Motion ¶ 37.) While this case certainly has unique challenges given the complexities of the FDIC's involvement, the Court has no reason at this point to conclude that these challenges are insurmountable to a reorganization. *See In re Lyondell Chem. Co.*, 402 B.R. at 590 (stating, "while if there are reasons to conclude that the debtor(s) could not reorganize, that plainly should affect debtors' ability to invoke this factor, where debtors are proceeding 'on track' and have met the challenges they have faced so far, that is sufficient"). UBS does not appear to contest that the Debtor meets this factor and notes only that the factor is "neutral." (Opposition ¶ 53.)

2.    The Debtor Will Suffer Irreparable Harm Unless the Arbitrations are Enjoined

Courts have explained that in a chapter 11 case, the "irreparable harm" requirement is satisfied where "the action sought to be enjoined would embarrass, burden, delay or otherwise impede the reorganization proceeding, or if a stay is necessary to preserve or protect the debtor's estate and reorganization prospects." *In re Alert Holdings, Inc.,* 148 B.R. 194, 200 (Bankr. S.D.N.Y. 1992); *In re Calpine,* 365 B.R. at 409 (observing that an injunction is appropriate not

only where irreparable harm is threatened to the estate but also "where the action to be enjoined is one that threatens the reorganization process") (internal quotation omitted).

Here, the Debtor has established that allowing the Arbitrations to continue as scheduled would materially jeopardize the Debtor's estate and restructuring prospects.  The Debtor has provided case law for the proposition that where, as here, the Debtor's personnel would be required to divert their attention away from the reorganization to a pending litigation against a non-debtor, the irreparable harm prong is met.  (*See* Motion ¶ 38 (citing *In re Calpine Corp.*, 365 B.R. at 410 (S.D.N.Y. 2007) (affirming bankruptcy court's finding that a "significant burden and distraction of key employees from its restructuring effort" constituted irreparable harm)); Motion ¶ 42 (citing *In re R&G Fin. Corp.*, 441 B.R. at 411 (enjoining FINRA arbitration against debtor's subsidiary where its "limited managerial resources would be diverted in assisting towards the preparation for such proceedings, meaning that its automatic stay protections under Section 362(a)(1) would in essence be violated")).)

The Debtor has provided evidence through the Heineman and Kosturos Declarations that the Arbitrations would divert attention away from the Debtor's restructuring.  Specifically, the Heineman Declaration, from SVB Securities' general counsel, attests that with the trial set to begin in under six weeks SVB Securities is now in the most critical and time intense stage of trial preparation.  (Heineman Decl. ¶ 14.)  Heineman further attests SVB Securities' senior management is currently focused on exploring strategic alternatives for SVB Securities as part of the Debtor's chapter 11 proceeding.  (*Id.* ¶ 13.)  At the hearing, Heineman testified that he is the only member of the four-person legal department with litigation experience and that he will be tasked with preparing the 25 defense witnesses for the Arbitrations, which will divert his attention form the restructuring process.  (*Id.* ¶ 12.)  He attested that the CEO, CAO, and other

members of senior management will testify and will thus have to divert their attention from the sale and restructuring process to prepare for their testimony for the Arbitrations. (*Id.* ¶ 14.) This evidence establishes that if the New York and California Arbitrations were to move forward, key company personnel would be diverted from the restructuring effort, causing irreparable harm to the Debtor. *See In re R&G Fin. Corp.*, 441 B.R. at 411.

Further, the Debtor has also provided evidence that SVB Securities, and by extension the attention of its employees, is particularly vital to the Debtor's reorganization success. The Debtor is a holding company which now derives the majority (according to the Debtor's latest annual 10-K, approximately $523 million or 89% of the Debtor's total revenue from contracts with customers after deducting the revenues derived from Silicon Valley Bank and SVB Private businesses, which are no longer associated with the Debtor) of its remaining revenues from its indirect wholly-owned subsidiary, SVB Securities. (Kosturos Decl. ¶ 10.) As a result, Kosturos, the Debtor's chief restructuring advisor, attests that as the Debtor's single largest source of revenue, the success of this Chapter 11 Case is closely tied to the performance of SVB Securities and the value that can be realized from SVB Securities through a sale or reorganization. (*Id.* ¶ 11.) Accordingly, the Debtor has further shown that, given the importance of maximizing the value of SVB Securities to the Debtor's restructuring process, diverting the attention of SVB Securities' key employees could cause irreparable harm to the Debtor's restructuring efforts. *Haw. Structural Ironworkers Pension Tr. Fund v. Calpine Corp.,* No. 06-CV-5358, 2006 WL 3755175, at *5 (S.D.N.Y. Dec. 20, 2006) (affirming the injunction of actions against a non-debtor where "the logistical stress on [the debtor] from attempting to simultaneously undertake a massive reorganization while monitoring and producing documents in the [s]tate [c]ourt [a]ction threatened to irreparably impair the company's reorganization process").

UBS's primary argument that the Debtor will not be harmed by the Arbitrations going forward is that the two SVB employees who would testify are employees of the non-debtor, SVB Securities, and not of the Debtor.  (Motion ¶¶ 42–45.)  It argues that UBS has "found no case" where the court has enjoined a proceeding against a non-debtor in order to shield the non-debtor's employees from testifying at trial.[3]  (Opposition ¶ 4.)  They also argue that the one employee of the Debtor who would testify, the former CEO Greg Becker, was fired so would plainly not be involved in the reorganization.  (Opposition ¶ 42.)  As an initial matter,  as of the petition date, the Debtor had no employees.[4]  (*See In re SVB Financial Group*, Case No. 23-10367, *Declaration of William C. Kosturos in Support of the Debtor's Chapter 11 Petition and First Day Pleadings*, ECF Doc. # 21, at 22 ("As of the petition date . . . the Debtor believes it did not directly employ any individual").  Accordingly, it is not as if the Debtor has a suite of its own employees who are unaffected by the pending litigation against non-debtors on whom it can rely.  By UBS's logic, as a matter of law, the Debtor could never receive a stay against a non-debtor due to the burden on its staff because such request would always involve non-debtor employees.  Thus, the fact that the case law the Debtor relies on involves the harm of the distraction to Debtor employees, rather than non-debtor employees, is not as UBS contends, fatal to the Debtor's argument.

*R&G Financial Group*, 441 B.R. 401, a case where the Court stayed a FINRA arbitration against a non-debtor, is illustrative.  UBS cites that case for the proposition that only the distraction of employees of the Debtor and not of non-debtor employees can be grounds for a

---

[3]     Debtor's counsel stated at the hearing that while UBS has only asked for the testimony of two SVB Securities' employees, the company expects that it would need to call other senior company employees to testify as part of the defense case if the Arbitrations go forward.

[4]     At the hearing, bankruptcy counsel for the Debtors indicated that the Debtor has begun to hire a few employees, but that most of the staff it relies on come from non-debtor affiliates.

stay.  (Opposition ¶ 43.)  But in *R&G Financial Group* the Court stayed the action against a non-debtor because litigation against the non-debtor subsidiary, a defunct entity without employees or assets, would divert the Debtor's "limited managerial resources towards preparation for such proceedings."  *Id*.  In essence, what *R&G Financial Group* recognized is that where one of two related companies lacks employees or resources and one of the companies is in bankruptcy, the Court looks at the whole picture between the two entities to determine whether the restructuring efforts will be harmed.  *See id.*  Nowhere in the *R&G* decision does the Court indicate that the fact that the fact that the employees diverted from restructuring efforts were those of the Debtors was necessary or even central to its conclusions.

UBS is right that part of the reason that the Court stayed the action in *R&G* was that in addition to the diversion of employees from the restructuring effort "the debtor would be responsible in providing . . . the legal costs of RCICs defense."  (Opposition ¶ 43 (citing 441 B.R. at 441).)  But as noted above, the Indemnification Documents establish that the Debtor's wholly owned subsidiary has already indemnified the Individual Respondents (and will do so in the future), so *R&G Financial Group* is directly on point.  (*See* Indemnification Documents.)

UBS's remaining arguments that the Debtor will not be harmed are similarly unavailing. The Court disagrees with UBS that the presence of outside counsel means that SVB Securities' general counsel need not be involved in the Arbitrations.  Mr. Heineman testified that he is the client contact responsible for handling the Arbitrations, including making strategic and tactical decisions, reviewing, and revising pleadings and motions, assisting with discovery, participating in witness interviews and other pre-hearing work.  (Heineman Decl. ¶ 14.)  Even with robust outside counsel, the Court concludes that the Arbitrations will require a significant investment of Mr. Heineman's time.  The Court also is also unconvinced that curtailing the length of the

witnesses' testimony, as UBS suggests, would significantly mitigate the burden on SVB

Securities' staff.  (Motion ¶ 21.)  Given SVB Securities' indemnification obligations it is

important that it be able to prepare and put on fulsome testimony of its defense witnesses, even if

UBS would limit its questioning of the witnesses.

Nor does the fact that counsel for SVB Securities indicated it anticipated "no issues" with

the testimony of SVB senior executives alter the Court's conclusion.  (Opposition ¶ 27.)  SVB

has put forth significant evidence that preparing for the Arbitration would distract key employees

from the important efforts to maximize the value of the estate.  (*See, e.g.*, Heineman Decl. ¶¶ 13–

15.)  The Court finds that the efforts to monetize SVB Securities accelerated quickly in the early

days of April, putting an increased burden on SVB Securities staff.  Notwithstanding what was

going on in late March, the looming Arbitration is currently putting a significant burden on SVB

Securities' staff given their responsibilities in the restructuring.

While the foregoing analysis applies in full force to the New York Arbitration, both UBS

and the Debtor provide fairly cursory analysis about the harm of the California Arbitration going

forward.  UBS notes that SVB Securities is not a party to the California Arbitration, such that the

harm to the reorganization is far more speculative.  (Opposition ¶ 51.)  UBS argues that any

harm assumes that Mr. Leerink and Mr. Gentile would testify in the June hearing, which they

seem to argue is not certain.  (Opposition ¶ 51.)  The Debtor argues that "while SVB Securities is

not a respondent in the California arbitration, it must play the same integral role in the

preparation for, and defense of the California Arbitration as in the New York Arbitration."

(Motion ¶ 40.)  SVB Securities is already indemnifying the Individual Respondents' counsel in

the New York and California Arbitrations, and Mr. Heineman is involved in preparing the

defense in both cases.

3. <u>The Balance of Harms Weighs in Favor of Enjoining the Arbitrations</u>

The harm facing the Debtor is that, in the absence of a stay, key personnel would have their attention diverted from the restructuring to the Arbitrations. The corresponding prejudice to UBS if the Court granted the stay is minimal. The Debtor is not seeking to permanently bypass the arbitration forum or force UBS to litigate its claims through the bankruptcy process. Granting the requested relief means that UBS, at worst, will wait a few months to prosecute its claim for money damages in the Arbitrations. That *de minimis* inconvenience does not outweigh the potential harm to the Debtor—namely, impairing and interfering with its ongoing restructuring efforts. *See, e.g., R&G Fin. Corp.*, 441 B.R. at 411–12 (finding balance of harms favored enjoining FINRA arbitration against debtor's subsidiary where the "preliminary injunction will not invalidate the alleged rights of the FINRA claimants but it will simply delay the enforcement of those rights.").

The Debtor argues that UBS's own actions demonstrate that the Arbitrations are not time sensitive. The Court agrees. First, UBS waited three full months after the Individual Respondents resigned and had started working at SVB Securities to bring the New York Arbitration. (Motion ¶ 44.) The Arbitrations have been pending since August 2021 and February 2022, respectively. (*Id.*) UBS seeks monetary damages only and has not moved for an injunction or a temporary restraining order.

Accordingly, other than the minimal prejudice of having to wait longer to prosecute its damages claims, UBS has not identified any irreparable harm to it that would flow from the stay of the Arbitration. In its Opposition, UBS argues that it will be harmed because the New York Arbitration has already been delayed and some witnesses are no longer available, such as the Debtor's former CEO. (Opposition ¶ 54). UBS argues that further delay will further erode its

ability to present its case as witnesses scatter and memories fade." (*Id.*)  As an initial matter, there is no evidence the Debtor's former CEO if in fact unavailable.  All UBS has established is that he is no longer under the Debtor's control.  Beyond that, UBS identifies no specific witnesses who will no longer be available if the Arbitrations are delayed.  UBS's vague argument that "memories fade" with delays is not compelling, especially when compared with the specific harm to the Debtor's reorganization that moving forward with the Arbitrations presents. (*Id.*)

### 4. Enjoining the Arbitrations Will Serve the Public Interest

Finally, enjoining the Arbitrations will serve the public interest.  "In the bankruptcy context, the relevant public interest is the interest in successful reorganizations, since reorganizations preserve value for creditors and ultimately the public." *In re Caesars Ent. Operating Co., Inc.*, 561 B.R. 441, 453 (Bankr. N.D. Ill. 2016); *accord Calpine Corp.*, 2006 WL 3755175, at *5 (explaining that this prong "requires a balancing of the public interest in successful bankruptcy reorganizations with other competing societal interests").  For the reasons discussed above, staying the Arbitrations will serve the public interest by maximizing the Debtor's opportunity for a value-maximizing strategic transaction. *See R&G Fin. Corp.*, 441 B.R. at 412 ("[T]he public interest is best protected if the Debtor continues to work in their reorganization rather than having to face immediate adverse economic consequences stemming from legal fees in the arbitration proceedings and the syphoning off of its limited managerial resources in such proceedings.").

The Court agrees with the Debtor that the public interest does not necessitate any special deference to FINRA or the arbitration process.  As the U.S. Supreme Court recently made clear, "a court may not devise novel rules to favor arbitration over litigation." *See, e.g., Morgan v.*

25

*Sundance, Inc.*, 142 S. Ct. 1708, 1713 (2022). The Second Circuit has also recognized that "[i]n the bankruptcy setting, congressional intent to permit a bankruptcy court to enjoin arbitration is sufficiently clear to override even international arbitration agreements." *In re U.S. Lines, Inc.*, 197 F.3d 631, 639 (2d. Cir. 1999). Here, the Debtor is not asking the Court to override an arbitration agreement in favor or resolution of the issues in the bankruptcy court, it is simply asking for a 120 day stay of the Arbitrations. This request is thus well within the mainstream of what the Second Circuit has deemed within the public interest.

## IV.    CONCLUSION

For the reasons discussed above, the Court **GRANTS** the Motion and **ENJOINS** the Arbitrations for 120 days. During the period of the stay, the parties shall work together in good faith to obtain rescheduled dates for the Arbitrations. Within seven (7) days from the date of this Order, counsel for the Debtor, the Committee, and UBS shall confer and submit any further order required to grant the relief requested in the Motion consistent with the terms of this Memorandum Opinion and Order.

**IT IS SO ORDERED.**

Dated:    April 14, 2023
         New York, New York

*Martin Glenn*

MARTIN GLENN
Chief United States Bankruptcy Judge